In re STAR BROADCASTING, INC., Debtor.

No. 05–35012–11.

United States Bankruptcy Court, N.D. Florida, Pensacola Division.

Jan. 20, 2006.

David E. Bailey, Jr., Pesacola, FL, for the Debtor.

John F. O'Sullivan, Jason Kellogg, Akerman, Senterfitt PA, Miami, FL, for Qantum Communications Corporation.

### ORDER ON QANTUM COMMUNICA-TION'S MOTION FOR RELIEF FROM AUTOMATIC STAY AND MOTION TO DISMISS

WILLIAM S. SHULMAN, Bankruptcy Judge.

This matter came on for hearing on Qantum Communication Corporation's motion for relief from automatic stay and motion to dismiss the Debtor's case. Appearances were as noted in the record. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). After due consideration of the pleadings, briefs, evidence, testimony and arguments of counsel, the Court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

The Debtor-in-possession, Star Broadcasting Inc. ("Star Broadcasting" or "Debtor"), owns and operates commercial radio stations in Florida and Alabama. Ronald E. Hale, Sr. ("Hale") is the General Manager of Star Broadcasting. Hale's wife and children own the company; however, Hale is in charge of the day-to-day operations and handles all business transactions related to Star Broadcasting. The Hales also own Gulf Breeze Media, Inc. ("Gulf Breeze") which owned and operated another radio station; Hale also served as the General Manager of Gulf Breeze. Hale has worked in the commercial radio industry since 1984, and has considerable experience with brokering deals to acquire and sell radio stations and their holdings.

In 2003, Hale began negotiating the sale of two radio stations to Qantum Communications Corporation ("Qantum"): WTKE, to be acquired by Star Broadcasting, and WMMK, from Gulf Breeze. The two stations were a "strategically essential part of [Qantum's] business plan to enter the Ft. Walton Beach market." Movant's Ex. 8, p. 2. On or about September 5, 2003, Qantum and Star Broadcasting signed an Asset Purchase Agreement ("the APA") for Qantum to purchase WTKE and its holdings for $3 million. At approximately the same time, Qantum signed a purchase agree-

ment to buy WMMK from Gulf Breeze. Star Broadcasting did not own WTKE at the time of the APA, but was trying to obtain it through a station swap with Clear Channel Communications, Inc. ("Clear Channel"), which required FCC approval. At the time of the APA with Qantum, there was some concern that the station swap between Star Broadcasting and Clear Channel would not be approved by the FCC.

The APA provided that either party could terminate the agreement with written notice starting eighteen months from the date of execution, i.e., by March 5, 2005. However, the party seeking to terminate the agreement must not be in breach when the termination notice is sent. See Movant's Exhibit 1, Section 17.1(g). The APA also contained a provision that prevented Star Broadcasting from attempting to sell WTKE to any other entity or encumber the station and/or its assets during the term of the agreement. See Movant's Exhibit 1, Section 8.9.

The evidence shows that Hale began negotiating with Lewis Dickey ("Dickey"), CEO of Cumulus Licensing L.L.C. ("Cumulus"), for the sale of WTKE in a series of e-mails dating from October 14, 2004. See Movant's Exhibits 18–23. Hale offered to sell WTKE to Cumulus after the APA with Qantum terminated on March 5, 2005. "Cumulus would provide 3Mil for the Bankruptcy and would receive WTKE–FM after the March 7th date". Movant's Exhibit 19; see also Movant's Exhibit 18. Dickey expressed interest in WTKE, but did not want to pay $3 million and wanted to know about the "Qantum litigation". Movant's Exhibit 21. Hale sent copies of the APA between Star Broadcasting and Qantum to Dickey to be reviewed by Cumulus's general counsel. Movant's Exhibits 24–26. Over the following months, Hale worked with Dickey and his attor-

neys to execute a contract for Cumulus to acquire WTKE. The e-mails between the various parties contain references to the Star Broadcasting/Qantum APA and how to avoid completing the deal with Qantum. See Movant's Exhibits 21, 23, 28, 30, 33, 36 and 44. Star Broadcasting issued a notice of termination to Qantum on April 14, 2005, and entered into a contract to transfer WTKE to Cumulus on April 18, 2005. Movant's Exhibit 11. Cumulus loaned Star Broadcasting the funds to purchase WTKE, and was given a lien on the WTKE assets. Qantum issued two notices of breach to Star Broadcasting outlining breaches of the original APA in January and May 2005.

In addition to the violation of the non-solicitation provision, Qantum alleges that Star Broadcasting also breached the APA by failing to provide a Local Marketing Agreement ("LMA") as required by Section 4.2. An e-mail dated December 16, 2004 from Hale to Richard Denning, Cumulus's general counsel, states:

> [W]e've been looking at several sections of the Qantum/Star contract that bother us .... Section 4.1, 4.2 and 17.1 Termination says that we would need to give them an LMA or be in breach if they buy WWRK (WMMK) so what can we do to not LMA it or have you come up with a way for Lew [Dickey of Cumulus] to slide into our position .... so how can we get around that .... I wonder if we need to blow up the WWRK deal by putting it into Chapter 7 ....
> Movant's Exhibit 27.

According to Qantum, Star Broadcasting also failed to negotiate in good faith for an option for Qantum to purchase a tower under Section 1.3 of the APA. Hale's wife owned a 50% interest in the tower at the time that the APA was signed. The other 50% owner wanted to sell his interest; he sold the 50% interest to a third party.

Subsequently, Hale's wife sold her 50% interest to the same third party, without attempting to obtain an option for Qantum to buy the tower.

On July 1, 2005, Qantum filed an action against Star Broadcasting in the United States District Court in Miami, Florida, (Case No. 05–21772) asking for declaratory relief, an injunction against Star Broadcasting transferring WTKE and its assets to Cumulus and specific performance under the APA. In preparation for the injunction hearing, Qantum deposed Hale, who testified that he had not negotiated with Cumulus for the sale of WTKE prior to March 5, 2005. Movant's Exhibit 3, pp. 55, 78–80. In contrast, Lewis Dickey of Cumulus testified during his deposition that he began talking with Hale about acquiring WTKE in October 2004. Movant's Exhibit 4, pp. 21–22. The e-mails between Hale and Dickey mentioned above also came to light during this phase of the litigation.

After a hearing on Qantum's motion for temporary restraining order and preliminary injunction, the district court found that Qantum was likely to succeed on the merits of its claim that Star Broadcasting and Hale were in breach of the APA and that Star Broadcasting's attempt to terminate the APA was invalid due to the breach. The court also found that Qantum was likely to succeed in proving that Star Broadcasting and Hale breached the non-solicitation provision under Section 8.9 of the APA. Movant's Exhibit 8. The court then set discovery deadlines and a trial date in early February 2006.

Star Broadcasting appealed the decision to the Eleventh Circuit Court of Appeals. Shortly after the appeal, counsel for Star Broadcasting, the law firm of Zuckerman Spaeder, moved to withdraw from the case. The court granted the motion and gave Star Broadcasting until November 11, 2005 to find replacement counsel. Star Broadcasting's appeal was also in danger of being dismissed because an initial brief had not been filed. Star Broadcasting filed its chapter 11 bankruptcy on November 10, 2005.

Star Broadcasting's summary of schedules lists $9.9 million in assets and $4.8 million in debt. The company has six unsecured creditors with claims of $356,968.18 of which Zuckerman–Spaeder is listed as being owed the disputed amount of approximately $236,000. At Star Broadcasting's § 341 meeting on December 22, 2005, Hale, as the representative of Star Broadcasting, was asked why the company filed a chapter 11 petition. Counsel for Star Broadcasting answered that the November 11, 2005 deadline for finding new counsel for the district court action "was the basis for filing and the timing", and Hale agreed with this statement. Movant's Exhibit 53, p. 51. When asked by the U.S. Trustee if there were other reasons for the filing, "other than this contractual dispute", Hale replied, "Absolutely not." Movant's Exhibit 53, p. 51. Star Broadcasting filed a motion to reject the APA with Qantum on November 30, 2005.

Star Broadcasting is not the first company managed by Hale to file a chapter 11 petition. As noted above, Gulf Breeze Media also entered an agreement with Qantum to sell the radio station, WMMK, in 2003. When a dispute arose over Gulf Breeze Media's obligations under the contract, Qantum filed an action against Gulf Breeze for specific performance. On May 7, 2004, Gulf Breeze filed a chapter 11 petition in this court, Case Number 04–31172, and sought to reject the Qantum contract. Gulf Breeze solicited another offer to buy WMMK and signed a contract to sell the station as part of its initial chapter 11 plan. Qantum objected to the

second offer, and eventually the new buyer withdrew it. Gulf Breeze then amended its chapter 11 plan and assumed Qantum's contract to purchase WMMK.

Star Broadcasting maintains that the negotiations with Cumulus were a back-up agreement in case the Qantum deal did not work out. To get WTKE, Star Broadcasting had to buy WQYZ in Ocean Springs, Mississippi and exchange it for WTKE. Both acquisitions were subject to FCC approval. A Clear Channel competitor in Ocean Springs contested the WQYZ deal; therefore, FCC approval was suspended until the dispute was settled. Hale testified that he knew early on that the Qantum deal could not be completed by the March 5, 2005 deadline because the WQYZ deal would not be approved by the FCC. Qantum produced a February 15, 2005 e-mail from Hale to Richard Denning, Cumulus's general counsel, that indicated "Clear Channel would like to close by eliminating the Exchange agreement and closing WTKE–FM before we close WQYZ–FM ... If that occurred after the Qantum drop dead date it might be helpful to us in giving Qantum less of a legal position ..." Movant's Exhibit 33, p. 2. At the trial of this matter, Hale testified that he did not know about the non-solicitation provision in the APA, until Qantum sent the May 2005 letter notifying Star Broadcasting that they had breached the section.

Hale also stated that Star Broadcasting could not fulfill its obligations under the Qantum APA because Star Broadcasting did not get all of the assets it expected to get from Clear Channel. The asset value of the deal was reduced by approximately $455,000. Qantum maintains that Star Broadcasting did not get all of the assets from the Clear Channel deal because Star Broadcasting withheld funds due under the Local Market Agreement with Clear Channel, and had to agree to pay back the funds at closing by taking less than all of the WTKE assets.

Star Broadcasting also alleges that Qantum breached the APA by failing to give notice that a $150,000 deposit, due when the APA was signed, had been paid. However, Star Broadcasting never raised the issue prior to the hearing on this matter. Qantum produced an e-mail from the escrow agent to Hale informing him that the money had been received. Movant's Exhibit 54.

## CONCLUSIONS OF LAW

Qantum argues that this Chapter 11 petition should be dismissed as a bad faith filing. Alternatively, Qantum filed a motion for relief from the automatic stay seeking an order terminating the automatic stay to permit Qantum to complete the pending litigation in the United States District Court and the Eleventh Circuit Court of Appeals. The motion for relief from the automatic stay is premised on the allegation that the Chapter 11 case was filed in bad faith and that Qantum lacks adequate protection.

11 U.S.C. § 1112(b) provides authority to dismiss a case for cause. It provides in part that:

(b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors

and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1) (2005).

Section 1112(b)(4) of the Code contains a list of non-exclusive grounds for dismissal. The list is not exhaustive and the Eleventh Circuit has held that "a debtor's lack of 'good faith' may constitute cause for dismissal of a petition." *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 674 (11th Cir.1984); *In re Natural Land Corp.*, 825 F.2d 296 (11th Cir.1987).

The automatic stay may be terminated for "cause" pursuant to § 362(d)(1) of the Bankruptcy Code. It provides that:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay–

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest. 11 U.S.C. § 362(d)(1).

■ "Further, a petition filed in bad faith also justifies relief from a stay." *In re Dixie Broadcasting Inc.*, 871 F.2d 1023, 1026 (11th Cir.1989), citing *In re Natural Land Corp.*, 825 F.2d 296 (11th Cir.1987). *Dixie Broadcasting Inc.* is very similar to the facts in the instant case. In *Dixie*, the Debtor entered into an agreement to sell a radio station. Despite signing a purchase and sale agreement, the Debtor continued to entertain other offers to purchase the station. When another corporation offered to buy the station for a higher price, the Debtor refused to consummate the sale. The Debtor granted a lien on its assets and agreed that it would not transfer the assets without approval of the lienholder. The purchaser then sued the Debtor in state court for specific performance. The court stated that "[a]lthough there is no

precise test for determining bad faith, courts have recognized factors which show an 'intent to abuse the judicial process and the purposes of the reorganization provisions'." *Dixie*, 871 F.2d at 1027; quoting *Natural Land*, 825 F.2d at 298; *see In re The Bal Harbour Club, Inc.*, 316 F.3d 1192, 1194 (11th Cir.2003); *In re Moog*, 159 B.R. 357, 360 (Bankr.S.D.Fla.1993). The court went on to list those factors which include the timing of the filing of the petition, whether the debtor is financially distressed, whether the petition was filed strictly to circumvent pending litigation, and whether the petition was filed solely to reject an unprofitable contract. *Dixie Broadcasting Inc.*, 871 F.2d at 1027.

Applying the law to the facts here, the actions of the Debtor demonstrate bad faith. This Chapter 11 is Mr. Hale's second attempt to avoid selling a radio station to Qantum. The first attempt was the Gulf Breeze Media, Inc. Chapter 11, in which the Debtor sought to reject the contract to sell the station to Qantum in order to make more profit by selling the station to another purchaser. After much litigation, Gulf Breeze eventually sold the station to Qantum through a confirmed plan. Now Mr. Hale has placed Star Broadcasting into a Chapter 11 with the same idea of rejecting the contract with Qantum in order to sell to another purchaser for more money. The petition in this case was filed merely as a litigation tactic after the United States District Court in Miami, Florida entered an order and a preliminary injunction in favor of Qantum and against Star Broadcasting. Star Broadcasting appealed the decision to the Eleventh Circuit Court of Appeals and was in danger of the appeal being dismissed because of failure to file its initial brief due to the withdrawal of its law firm, Zuckerman, Spaeder. The Debtor was faced with a February 2006 trial date in the United States District

Court and was under an order to find new counsel. Instead, Star Broadcasting filed its petition in bankruptcy.

In the district court action, considerable discovery was taken in the form of depositions and production of voluminous documents. The district court held a hearing on the temporary restraining order and preliminary injunction and entered an order concluding that Qantum was likely to succeed on the merits of its claim, that the Debtor and Hale were in breach of the agreement and that the attempted termination of the asset purchase agreement by Hale was invalid. The district court also concluded that the evidence produced by both parties including the depositions of Hale and Dickey showed that Qantum was likely to succeed in proving that the Debtor and Hale breached Section 8.9 of the APA by soliciting Cumulus since October 2004.

The evidence in the instant case reveals that Mr. Hale swore falsely in the district court action. In his deposition in the district court litigation, Hale testified there had been no negotiations with Cumulus prior to March 2005. Qantum later discovered documentary evidence and testimony from Mr. Dickey, CEO of Cumulus, that directly contradicted Hale's testimony under oath and revealed that negotiations had been ongoing for months prior to the date Hale gave.

During the hearing on the motions to dismiss and for relief from the stay, Hale testified that Qantum had not paid an escrow deposit of $150,000 under Section 3.2 of the APA dealing with the purchase price. Approximately one week before the bankruptcy hearing was the first time the issue was raised, implying that Qantum was in default of the APA by failing to post the escrow money as part of the purchase price. The facts showed that the escrow had been paid and that Hale had

been notified of payments in September 2003. Such posturing by the witness indicated a very selective memory on an issue he raised as a defense to the motions to dismiss and relief from the stay. This Court has observed Hale as a witness and his demeanor on the stand and concludes that his responses to certain questions have been evasive, contradictory and not credible. In particular, his testimony regarding the breach of the non-solicitation provision under Section 8.9 of the APA is contradicted by the overwhelming weight of the evidence. This lack of credibility is further compounded by the testimony of Timothy Brady, a communications attorney who acted as the FCC attorney for Star Broadcasting. He worked on the deal to sell the WTKE station to Cumulus and to obtain the FCC approval to change the broadcasting license in October 2004. He maintained that he did not discover the non-solicitation provision of the APA (Section 8.9) until early March 2005, when he received a letter. Brady testified that he reviewed only parts of the APA and did not read Section 8.9, although he reviewed Section 8.10 of the APA, which is juxtaposed 1 ¾ inches below the bold print of Section 8.9 "Non–Solicitation" on the same page. The evidence indicates that not only Hale was aware of the non-solicitation provision, but Mr. Brady was also aware, and that Star Broadcasting was making a clear effort to sell the WTKE station despite the contractual provisions to the contrary.

If Star Broadcasting was in breach of the APA, then it was not in a position to terminate the APA under the terms of the agreement. This inconvenience did not deter the Debtor from negotiating a more profitable deal with Cumulus, which prompted the district court litigation. Other breaches are alleged to have occurred, such as regarding the LMA (local

marketing agreement), the option to purchase a tower, and placing a lien on its assets, but for purposes of this decision, the Court does not have to reach the ultimate issue of whether the breaches occurred.

The evidence shows that prior to the district court litigation, Star Broadcasting and Hale carefully crafted a scheme to hide information from Qantum regarding contractual breaches. The emails show a concerted effort to make sure the Qantum contract would not be consummated which would enable Star Broadcasting and Hale to enter into a more profitable deal with Cumulus.

■ The Debtor's strategy in this case was simple. The Debtor would file its motion to reject the contract, halt the district court litigation and the Eleventh Circuit appeal by virtue of the automatic stay and seek to have the bankruptcy court ultimately approve this through a plan of reorganization. At the first meeting of creditors the Debtor clearly stated that the sole reason for filing a Chapter 11 was to avoid the contract. From the Debtor's schedules, it appears that it has over $9.9 million in assets with existing liabilities of $4.8 million. The Court concludes that based on the timing of the filing of the petition, the Debtor's own schedules showing an equity position of over $5 million in assets over liabilities, the attempt to circumvent pending litigation and the attempt to reject what the Debtor perceived as an unprofitable contract constitutes bad faith in this case and that "cause" exists under § 362(d)(1) to lift the automatic stay.

In this case, certain creditors of the Debtor have requested that the Court deny Qantum's motion to dismiss and motion for relief from the automatic stay. The Court notes that the Debtor does have assets in addition to those that were sold under the WTKE sale, and if the case were dismissed, creditors other than Qantum may incur even greater losses.

■ With respect to the motion for relief from the automatic stay, the Court must not only consider "cause", but determine whether Qantum has any adequate protection of its interest in property. 11 U.S.C. § 362d(1). Qantum has an interest in property of the bankruptcy estate because of its right to buy the WTKE radio station assets under the APA. The district court pointed out in pages 6 and 7 of its order that in the APA, both parties agreed to a provision in the agreement that the WTKE assets "are unique and cannot be readily obtained in the open market." Therefore, the district court concluded that Qantum was entitled to the injunction to stop the sale to another party.

WTKE is a unique property due to its relative position in the local and national markets, its location, its licensing and frequency, its assets and its strategic importance in Qantum's overall business plan. Section 17.4 of the WTKE purchase agreement which was referred to by the district court states:

> [Star Broadcasting] and [Hale] each agrees that [WTKE] is unique and cannot be readily obtained on the open market and that [Qantum] will be irreparably injured if this Agreement is not specifically enforced. Therefore, in the event that [Qantum] institutes any action specifically to enforce [Star Broadcasting] and [Hale's] performance under this Agreement, [Star Broadcasting] and [Hale] each agrees to waive the defense that [Qantum] has an adequate remedy at law and to interpose no opposition, legal or otherwise, as to the propriety of specific performance as a remedy.

Qantum's arrangement with the Debtor and Gulf Breeze Media, Inc., both owned

by Hale's wife and children, and both managed by Hale, was a package deal to acquire two Fort Walton Beach radio stations. The two agreements signed on September 5, 2003 were intended to confer upon Qantum the economic benefits of two additional stations in the Fort Walton Beach Market and also to enhance the value of Qantum's existing stations in that market. Qantum obtained the radio station from Gulf Breeze Media only after much litigation in the Gulf Breeze Chapter 11. Qantum maintains that it is operating under a business plan that depends in part on the acquisition of the WTKE assets, especially after having consummated the associated acquisition in the same market of the Gulf Breeze station.

Just as in the *Dixie* case where the court stated "the Bankruptcy Court found that WBHP's (the buyers) interest was inadequately protected given the unique character of an FCC license...", Qantum's interest as a buyer of the assets including an FCC license cannot be adequately protected unless it is allowed to proceed with the district court litigation and seek specific performance. This Court finds that there is a lack of adequate protection under § 362(d)(1). The district judge is well equipped to dispose of the litigation since he has already had one hearing, has scheduled the matter for a final hearing in February 2006 and is familiar with the facts of the case and the evidence. Therefore, this Court concludes that the motion for relief from the automatic stay is due to be granted. The Court finds that Qantum cannot be furnished adequate protection and that cause exists due to the bad faith filing of the Debtor. The Court further finds that because the Debtor has substantial assets other than those involved in the district court litigation, it is not in the best interests of the creditors and the estate to dismiss the case at this time. It is hereby

ORDERED that Qantum's motion for relief from the automatic stay is GRANTED, and Qantum may complete the litigation in the United States District Court for the Southern District of Florida and the pending appeal in the Eleventh Circuit Court of Appeals; and it is further

ORDERED that this order shall be effective immediately upon entry pursuant to Bankruptcy Rule 4001(a)(3) and the stay shall remain terminated in the event the case is converted to another Chapter under Title 11 of the United States Code or if the case is subsequently dismissed and re-filed; and it is further

ORDERED that Qantum's motion to dismiss the case is DENIED.